**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| TAMMIE ROBINSON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 12-CV-109-JED-FHM |
| | ) | |
| 1.  ST. JOHN MEDICAL CENTER, INC., and | ) | |
| 2.  ST. JOHN HEALTH SYSTEM, INC. | ) | |
| | ) | |
| Defendant. | ) | |

---

### PLAINTIFF'S BRIEF IN OPPOSITION TO SUMMARY JUDGMENT

---

**RESPECTFULLY SUBMITTED THIS 12th DAY OF AUGUST, 2013.**

s/ Mark Hammons
Mark Hammons, OBA No. 3784
Amber Hurst, OBA No. 21231
Hammons, Gowens, Hurst & Associates
325 Dean A. McGee Avenue
Oklahoma City, Oklahoma 73102
Telephone:  (405) 235-6100
Facsimile: (405) 236-6111
Email: amberh@hammonslaw.com

## TABLE OF CONTENTS

Table of Authorities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i-v

PLAINTIFF'S BRIEF IN OPPOSITION TO SUMMARY JUDGMENT . . . . . . . . . . . . . . . . 1

I (A).   PLAINTIFF'S RESPONSE TO DEFENDANTS' FACTS . . . . . . . . . . . . . . . . . . . . . . 1

I(B).   PLAINTIFF'S ADDITIONAL FACTS PRECLUDING JUDGMENT . . . . . . . . . . . . 5

II.   THE STANDARD FOR SUMMARY JUDGMENT . . . . . . . . . . . . . . . . . . . . . . . . 12

III.   THE PRIMA FACIE CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    A.   The Prima Facie Case Of Termination . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

    B.   The Prima Facie Case Of Retaliation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

        1.   The Complaint Was A Protected Act . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.   Timing Establishes The Causal Connection . . . . . . . . . . . . . . . . . . . . 17

IV.   EVIDENCE OF PRETEXT AND DISCRIMINATION/RETALIATION . . . . . . . . . . 18

V.   THE PUBLIC POLICY CLAIM . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    A.   A Public Policy Exists . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    B.   Causation Is Shown . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

Certificate of Service . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

## TABLE OF AUTHORITIES

### UNITED STATES SUPREME COURT

***AMTRAK v. Morgan,*** 536 U.S. 101 ( 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

***Bourjaily v. United States,*** 483 U.S. 171 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

***Burlington Indus. v. Ellerth,*** 524 U.S. 742 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

***Burlington Northern & Santa Fe Ry. v. White,*** 548 U.S. 53 (2006) . . . . . . . . . . . . . . . . . . 16

***Clark County Sch. Dist. v. Breeden,*** 532 U.S. 268 (2001) . . . . . . . . . . . . . . . . . . . . . . . . . 15

***Crawford v. Metro. Gov't of Nashville & Davidson County,*** 555 U.S. 271 (2009) . . . . . . . . 17

***Faragher v. City of Boca Raton,*** 524 U.S. 775 (1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

***Mathews v. Eldridge,*** 424 U.S. 319 (1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

***McDonnell Douglas Corp. v. Green,*** 411 U.S. 792 (1973) . . . . . . . . . . . . . . . . . . . . . . 25

***Metropolitan Edison Co. v. N.L.R.B.,*** 460 U.S. 693 (1983) . . . . . . . . . . . . . . . . . . . . . . . 21

***Reeves v. Sanderson Plumbing Products, Inc.,*** 530 U.S. 133 (2000) . . . . . . . . . . . . 19, 20, 21

***Robinson v. Shell Oil Co.,*** 519 U.S. 337 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

***Scott v. Harris,*** 550 U.S. 372 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

***Snyder v. Louisiana,*** 552 U.S. 472 (2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

***United States v. Diebold, Inc.,*** 369 U.S. 654 (1962) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

***University of Texas Southwest Medical Center v. Nassar.,*** 570 U.S. __, 133 S.Ct. 2517 (2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

***Waters v. Churchill,*** 511 U.S. 661 (1994) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

### UNITED STATES COURTS OF APPEAL

***Antonio v. Sygma Network, Inc.,*** 458 F.3d 1177 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . 19

***Baca v. Sklar,*** 398 F.3d 1210 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

***Bell v. AT&T,*** 946 F.2d 1507 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

***Bryant v. Farmers Ins. Exch.,*** 432 F.3d 1114 (10th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 19

***Burk v. K Mart Corp.,*** 956 F.2d 213 (10th Cir. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Chaney v. Plainfield Healthcare Ctr.,* 612 F.3d 908 (7th Cir. 2010) . . . . . . . . . . . . . . . . . . 18

*Conner v. Ft. Gordon Bus Co.*, 761 F.2d 1495 (11th Cir. 1985) . . . . . . . . . . . . . . . . . . . 20

*Cortez v. Wal-Mart Stores, Inc.,* 460 F.3d 1268 (10th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . 20

*Davidson v. Am. Online, Inc.,* 337 F.3d 1179 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . 25

*Denison v. Swaco Geolograph Co.*, 941 F.2d 1416 (10th Cir. 1991) . . . . . . . . . . . . . . 17

*Doebele v. Sprint/United Management Co.,* 342 F.3d 1117 (10th Cir. 2003) . . . . . . . . . . . . 21

*EEOC v. Horizon/CMS Healthcare Corp.*, 220 F.3d 1184 (10th Cir. 2000) . . . . . . . . . . . . . 22

*EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160 (4th Cir. 2004) . . . . . . . . . . . . . . . . . . . 13

*Greene v. Safeway Stores, Inc.*, 98 F.3d 554 (10th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . 12

*Hardy v. S.F. Phosphates Ltd. Co.,* 185 F.3d 1076 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . 21

*Hartsel v. Keys,* 87 F.3d 795 (6th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Hertz v. Luzenac Am., Inc.*, 370 F.3d 1014 (10th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 15

*Jackson v. Albuquerque,* 890 F.2d 225 (10th Cir. 1989) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Jones v. Okla. City Pub. Schs,* 617 F.3d 1273 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . 22

*Kendrick v. Penske Transp. Servs.,* 220 F.3d 1220 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . 14

*Lam v. University of Hawaii,* 40 F.3d 1551 (9th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 18

*MacDonald v. Eastern Wyoming Mental Health Center,* 941 F.2d 1115 (10th Cir. 1991)
. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

*Machinchick v. PB Power, Inc.,* 398 F.3d 345 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . 21

*McAlester v. United Air Lines, Inc.,* 851 F.2d 1249 (10th Cir. 1988) . . . . . . . . . . . . . . . . . . 21

*McKissick v. Yuen,* 618 F.3d 1177 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Medlock v. UPS, Inc.,* 608 F.3d 1185 (10th Cir. 2010) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*O'Shea v. Yellow Technology Services, Inc.,* 185 F.3d 1093 (10th Cir. 1999) . . . . . . . . . 13, 19

*O'Toole v. Northrop Grumman Corp.,* 305 F.3d 1222 (10th Cir. 2002) . . . . . . . . . . . . . . 13, 23

*Oliver v. Peter Kiewit & Sons/Guernsey Stone,* 106 Fed.Appx. 672 (10th Cir. 2004) . . . . . . . 15

*Orr v. City of Albuquerque,* 531 F.3d 1210 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Perry v. Woodward,* 199 F.3d 1126 (10th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*Rapid Transit Lines, Inc. v. Wichita Developers, Inc.,* 435 F.2d 850 (10th Cir. 1970) . 24

*Robinson v. Cavalry Portfolio Servs., LLC,* 365 Fed. Appx. 104 (10th Cir. 2010) . . . . . . . . 15

*Seamons v. Snow,* 206 F.3d 1021 (10th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

*Stinnett v. Safeway, Inc*. 337 F.3d 1213 (10th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . 21

*Trainor v. Apollo Metal Specialties, Inc*., 318 F.3d 976 (10th Cir. 2002) . . . . . . . . . . . . 12, 13

*Trujillo v. PacifiCorp*, 524 F.3d 1149 (10th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . 18, 21

*United States v. Sneed,* 34 F.2d 1570 (10th Cir. 1994) . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*White v. Baxter Healthcare Corp*., 533 F.3d 381 (6th Cir. 2008) . . . . . . . . . . . . . . . . . . . 19

*Williams v. Vitro Servs. Corp*., 144 F.3d 1438 (11th Cir. 1998) . . . . . . . . . . . . . . . . . . . . . 19

## UNITED STATES DISTRICT COURTS

*Barefield v. Bd. of Trs*., 500 F. Supp. 2d 1244 (E.D. Cal. 2007) . . . . . . . . . . . . . . . . . . . . 20

*Dunning v. National Indus.,* 720 F. Supp. 924 (M.D. Ala.1989) . . . . . . . . . . . . . . . . . . . . 20

*Green v. Bd. of County Comm'rs*, 2007 U.S. Dist. LEXIS 42995 (W.D. Okla. 2007) . . . . . . 23

*Holt v. Wesley Med. Ctr*., 2004 U.S. Dist. LEXIS 13814 (D. Kan. 2004) . . . . . . . . . . . . . . . 25

*Neely v. City of Broken Arrow*, 2007 U.S. Dist. LEXIS 39256 (N.D. Okla. 2007) . . . . . . . . 24

## OKLAHOMA SUPREME COURT

*Buckner v. General Motors Corp.,* 1988 OK 73, 760 P.2d 803 . . . . . . . . . . . . . . . . . . . . . . 25

*Darrow v. Integris Health, Inc.,* 2008 OK 1, 176 P.3d 1204  . . . . . . . . . . . . . . . . . . . . 23, 24

*Elzey v. Forrest,* 1987 OK 58, 739 P.2d 999 (Okla. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Gaines v. Comanche County Med. Hosp.,* 2006 OK 39, 143 P.3d 203, 209-201 . . . . . . . . . . 25

*Gilmore v. Enogex, Inc.,* 1994 OK 76, 878 P.2d 360 . . . . . . . . . . . . . . . . . . . . . . . . . . 22, 23

*Hayes v. Eateries, Inc.,* 1995 OK 108, 905 P.2d 778 . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*Reynolds v. Advance Alarms, Inc.,* 2009 OK 97, 232 P.3d 907 . . . . . . . . . . . . . . . . . . . . . 23

*Vasek v. Bd. of County Comm'rs,* 2008 OK 35, 186 P.3d 928 . . . . . . . . . . . . . . . . . . . . . . 22

*Wallace v. Halliburton Co.,* 1993 OK 24, 850 P.2d 1056 (Okla. 1993) . . . . . . . . . . . . . . . . 25

**OKLAHOMA STATUTES**

59 O.S. § 567.8 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

59 O.S. § 567.9 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

**FEDERAL STATUTES**

42 U.S.C. §2000e–2(m) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

**OTHER AUTHORITY**

OAC 485:10-11-1(b)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

<u>**PLAINTIFF'S BRIEF IN OPPOSITION TO SUMMARY JUDGMENT**</u>

**COMES NOW THE PLAINTIFF,** and shows the Court as follows:

**I(A). - PLAINTIFF'S RESPONSE TO DEFENDANTS' FACTS**

**RDF1-2:**[1] Admitted.

**RDF3:** Denied.  There is nothing in the cited portion referring to "primary nursing care".  Plaintiff testified that "she was my patient and so that was my responsibility."  Ex 1 Tr Plf, p. 115, ln 23-24 (referring to knowledge of diagnosis).  Plaintiff's job description requires that she "ensures consistent clinical standards of care and **intervenes clinically as appropriate**", "ensure physician-specific plan of care is being followed for all patients", "**Propose alternative treatment to ensure a cost effective and efficient plan of care,**" and "**Modifies or changes the plan as needed based on the evaluation of its effectiveness**."  Ex 14 (Job Description, p. 2, emphasis supplied).

**RDF4-7:** Not contested, although evidence supporting the facts is not referenced.

**RDF8:** Not contested.  The March 8 and 9 meeting dates are admitted.

**RDF9:** Not contested with the addition that the medical staff treating the patient labeled the patient as "difficult" and a "problem", downplayed the seriousness of the patient's medical condition and applied stereotypes.  Ex 1 Tr Plf, p. 117, ln 16 to p. 119, ln 16.

**RFD10:** Not contested.

**RDF11:** Admitted in part, denied in part.  The team was discharged by the patient during its last meeting with the patient.  Ex 2 Tr Schram, p. 21, ln 12-21.

**RDF12:** Admitted in part, denied as to Plaintiff's duties which are set out in RDF3.

**RDF13:** Not contested, but irrelevant.

**RDF14:** Denied in part.  Plaintiff denies she spoke with a physician, but admits she spoke with a nurse at UT Southwest.  Ex 1 Tr Plf, p. 177, ln 3-17.  **Defendant offers no evidence that a request for an attending physician is required to secure information.  Defendant admits**

---

[1] For consistency, Plaintiff will refer to Defendants' numbered facts as "DF", to Plaintiff's response to Defendants' facts as "RDF" and to Plaintiff's facts as "PF".

**Plaintiff never violated a written rule, policy or guideline**. Ex 3 Tr Valenzuela, p. 32, ln 21 to p. 33, ln 34, ln 21; p. 36, ln 16 to p. 38, ln 14. Plaintiff's job description requires that she "**Actively seeks innovative methods of learning information relevant to Case Management practice**" and "**Actively participates in staff and physician education regarding case management, managed care, community resources and other related issues.**" Ex 14 (Job Description, p. 3,Bates 190).  Seeking information is consistent with those duties.  Ex 1 Tr Plf, p. 176, ln 1 to p. 178, ln 15.

**RDF15:** Denied in substance as Plaintiff was *instructed* by Valenzuela (Plaintiff's supervisor) to obtain a hematologist for the patient, telling Plaintiff this was her job.  Ex 1 Tr Plf, p. 133, ln 5-11.  Defendants were trying to find an Oklahoma City hematologist because one could not be found in Tulsa.  Ex 1 Tr Plf, p. 284, ln 13 to p. 285, ln 14.

**RDF16:** Not contested.  Such action was part of Plaintiff's job responsibilities as the RN Case Manager and not in violation of any written rule, policy or directive.  Ex 1 Tr Plf, p. 286, ln 2 to p. 287, ln 19; Ex 3 Tr Valenzuela, p. 34, ln 25 to p. 36, ln 2.  Also RDF 3, 14 & Ex 14 (Job Description, p 2).

**RDF17:** Admitted, however Plaintiff was given permission before speaking to the patient.  Ex 1 Tr Plf, p. 170, ln 19 to p. 171, ln 8.  Plaintiff did not **recommend** the alternative treatment, but asked about it. Ex 1 Tr Plf, p. 278, ln 11 to p. 279, ln 1. Asking about an alternative treatment was a duty under Plaintiff's job description.  Ex 1 Tr Plf, p. 259, ln 12 to p. 260, ln 18; Ex 4 Tr Martin, p. 48, ln 10 to p. 49, ln 3; Ex 14 (Job Description, p 3).

**RDF18-25:** Plaintiff admits Dr. Mohammad's and Martin's complaint, however Plaintiff had not violated any written, rule or policy,  Ex 3 Tr Valenzuela, p. 36, ln 16-22, and her actions were part of her job duties. Ex 14 (p 2); RDF 14-17; Ex 5 Plf Aff. Para. 6.  It was not until the March 11 meeting that Plaintiff was told not to work outside the circle of doctors and Plaintiff thereafter abided by that suggestion.  Ex 1 Tr Plf, p. 283, ln 2 to p. 287, ln 23, p. 290, ln 20 to p. 291, ln 4; Ex 3 Tr Valenzuela p. 72, ln 12 to p. 73, ln 20; Ex 5 Plf Aff. Para. 5. The inquiry about securing a hematologist was made at Kim Ballew's instruction.  RDF5;

2

Ex 1 Tr Plf, p. 284, ln 13 to p. 285, ln 14; Ex 5 Plf Aff. Para. 6.  The transportation inquiry was both part of Plaintiff's job description and a decision made by the patient's social worker.  Ex 1 Tr Plf, p. 284, ln 5 to p. 285, ln 22.

**RDF26:** Not contested as Valenzuela's testimony, however Plaintiff did not violate any written rule or procedure.  Ex 3 Tr Valenzuela, p. 32, ln 13 to p. 36, ln 24.  Such actions were part of Plaintiff's job description which imposed a responsibility to "**intervene[] clinically as appropriate**" and "**Propose alternative treatment to ensure a cost effective and efficient plan of care**".  Ex 14 (Job Description, p. 2, emphasis supplied).  While Valenzuela claimed the job did not mean "talking to other physicians", she admitted that this was not stated in the description.  Ex 3 Tr Valenzuela, p. 37, ln 22 to p. 38, ln 14.  Plaintiff states she did not know at the time that her conduct could be viewed as improper.  Ex 1 Tr Plf, p. 281, ln 13 to p. 282, ln 2; p. 284, ln 5 to p. 287, ln 19 (stating that actions were part of her job duty).

**RDF27-29:** Not contested as to the claim that there were complaints about Robinson's activities in "**intervene[ing] clinically as appropriate**" and "**Propose alternative treatment to ensure a cost effective and efficient plan of care**".  Ex 14 (Job Description, p. 2, emphasis supplied).  In particular, complaints were made that Plaintiff "empowered the pt [patient]".  Plf Ex 15 (Valenzuela's notes at Bates 198).  Not contested Valenzuela fired the Plaintiff.

**RDF30-33:** Admitted in part, but this is not all of the evidence of race discrimination.  Around Feb. 11, 2011 Plaintiff's white co-worker told Plaintiff that she knew of another "black" woman who, like Plaintiff, was "loud and aggressive"and that because Plaintiff was black she could never "play the dumb blonde".  Ex 1 Tr Plf, p. 307, ln 1 to p. 308, ln 12; Ex 6 Plf's Int. Resp. (Int. No. 11, p. 10-11).  Plaintiff testified she was "very offended " Ex 1 Tr Plf, p. 79, ln 11 to p. 80, ln 2; Ex 6 Plf's Int. Resp. (Int. Nos. 3, 16, ps. 7-8, 13).  Plaintiff reported this to Valenzuela, (*id.*, p. 74, ln 23-25; Ex 1 Tr Plf, p. 108, ln 16-20) who denies receiving the report (Ex 3 Tr Valenzuela, p 52, ln 11-17) but admits that, if made, Plaintiff's report was a report of discrimination.  Ex 3 Tr Valenzuela p. 54, ln 20-25. Valenzuela seemed angry with the Plaintiff and told her to "forget everything" that was said and that Plaintiff needed

"thicker skin".  Ex 6 Plf's Int. Resp. (Int. Nos. 3, 16, ps. 7-8, 13);  Ex 1 Tr Plf, p. 74, ln 23 to p. 75, ln 9.

**RDF34-35:** Admitted.  A female physician stated the patient was still suffering pain, did not know the patient's particular disease, but said patient did not "warm our hearts".  This indicated to the Plaintiff that the defendant was conditioning treatment on the ability of the patient to "warm" their "hearts".  Ex 1 Tr Plf, p. 153, ln 4 to p. 154, ln 14; Ex 6 Plf's Int. Resp. (Int. Nos. 13, p. 11-12).  **Plaintiff reported this** to Victor (a fellow nurse), Trish Allen (a fellow nurse); Ashley Casey (a fellow nurse), Sammie Valenzuela (her supervisor) and possibly Kim Ballew (a fellow nurse).  Ex 1 Tr Plf, p. 154, ln 20-14; p. 158, ln 1-7; p. 159, ln 4-10, p. 279, ln 24 to p. 280, ln 8; Ex 5 Plf Aff, Para. 2.

**RDF36:** Admitted in part.  DF36 is not a complete list of the reasons for Plaintiff's belief.  See the lack of knowledge and expression that the patient did not warm hearts set out in RDF37.  Also the patient's pain was not improving, and even after more than a week of hospitalization, her pain level was reported as the most severe, 10 out of 10, which is considered uncontrolled pain; the patient was black, but none of the treating doctors or nurses were black except the Plaintiff.  This combined with the very negative comments made in the medical records about the patient being a drug seeker, and the doctor's comment that the patient did not "warm our hearts", led Plaintiff to believe the physicians were stereotyping the patient and conditioning treatment based on this stereotype (Ex 1 Tr Plf, p. 153, ln 4 to p. 154, ln 14; p. 118, ln 16 to p. 119, ln 16); the patient tested positive for MRSA, but was not being treated with antibiotics; and the physicians were ignoring the patient's need for fluids.  Ex 6 Plf's Int. Resp. (Int. Nos. 13, p. 11-12); Ex 1 Tr Plf, p. 117, ln 16 to p. 120, ln 4; p. 125, ln 23 to p. 127, ln 8; p. 162, ln 1 to p. 163, ln 4; p. 191, ln 6 to p. 192, ln 24; p. 341, ln 9 to p. 342, ln 12 (describing concerns set out above); Ex 2 Tr Dr. Schram, p. 30, ln 10 to p. 31, ln 3 (describing patient's pain as a "10")..

**RDF37:** Admitted, in part, but Plaintiff, as part of her job duties, reviewed medical records and conferred with doctors and nurses about the patient.  Ex 1 Tr Plf, p. 118, ln 16-25; p. 121,

ln 11 to p. 122, ln 9.  Plaintiff researched material from the National Institute of Health (NIH), including "The Management of Sickle Cell Disease", and studied Milliman, a nursing guide.  Plaintiff put a copy of Milliman in Valenzuela's mailbox to reminder her of the guidelines and standards of care for the patient.  Ex 1 Tr Plf, p. 121, ln 20 to p. 122, ln 7, p. 162, ln 1 to p. 163, ln 8, p. 176, ln 6 to p. 177, ln 5, p. 287, ln 13 to p. 288, ln 18, p. 355, ln 11 to p. 356, ln 2; Ex 5 Plf Aff, Para. 3; Def Ex 7 at EEOC ROB 92.

**RDF38:** Admitted, however Plaintiff knew at least one treating physician was unaware of the nature of the patient's illness.  Ex 6 Plf's Int. Resp. (Int. Nos. 13, p. 11-12); Ex 1 Tr Plf p. 153, ln 4 to p. 154, ln 14.  RDF34-35.

**RDF39:** Admitted in part.  Although Plaintiff has extensive experience with the effects of sickle cell anemia as the mother of a child with sickle cell and did research (RDF 37) she does not consider herself to be an expert.  Ex 1 Tr Plf, p. 121, ln 1-16.

**RDF40:** Not contested in part, but it was Plaintiff's job duty to "**Ensure[] consistent clinical standards of care and intervene[] clinically as appropriate**" and "**Propose alternative treatment to ensure a cost effective and efficient plan of care,**" and "**Modif[y] or change[] the plan as needed based on the evaluation of its effectiveness**."  Ex 14 (Job Description, p. 2, emphasis supplied).

**RDF41:** Admitted in part, denied in part.  Plaintiff did observe actions that seemed clinically inappropriate and which are described in RDF36.

**RDF42:** Partially admitted.  Plaintiff  was required to report her concerns to Valenzuela because of the potential to place the patient in jeopardy.  Ex 1 Tr Plf, p. 199, ln 2 to p. 200, ln 13.

**RDF43:** Not contested, but irrelevant.

**RDF44:** Admitted, that Plaintiff did not neglect the patient, however Defendants admit firing the Plaintiff because of her actions on the patient's behalf including "empowering the patient". See DF 18-29.

## I(B). - PLAINTIFF'S ADDITIONAL FACTS PRECLUDING JUDGMENT

**PF1:** The Plaintiff, Tammie Robinson, is an African American (black) nurse who during

the relevant time period worked as a Case Manager for the Defendants.  Ex 3 Tr Valenzuela p. 11, ln 23 to p. 12, ln 3; Ex 1 Tr Plf, p. 10, ln 12-16.

**PF2:**  Plaintiff's supervisor and the person who made the termination decision was Sammye Valenzuela (white).  Ex 3 Tr Valenzuela, p. 7, ln 7-8; p. 11, ln 21-22; p. 14, ln 13-18; Ex 12 (Termination Doc showing Valenzuela as supervisor).

**PF3:**  Plaintiff was qualified for the Case Manager position in terms of abilities, education and experience and performed her job satisfactorily as testified to by Plaintiff and shown in Plaintiff's most recent performance evaluation.  Ex 3 Tr Valenzuela, p. 86, ln 20 to p. 87, ln 5; Ex 1 Tr Plf, p. 243, ln 1 to p. 246, ln 5; Ex 7 (Plf Perf Eval, at EEOC ROB 44-49).

**PF4:**  Plaintiff was replaced by Mary O'Connell (white) and Adele Chick (white), neither of whom had complained of discrimination or patient mistreatment.  Ex 8 Def Resp Int. No. 8 (p 9); Ex 3 Tr Valenzuela, p. 86, ln 4-19.

**PF5:**  About March 4, 2011 an African American patient was admitted to the hospital with sickle cell anemia.  Ex 1 Tr Plf, p. 115, ln 10 to p. 117, ln 8, p. 123, ln 24 to p. 124, ln 20; DF12.

**PF6:**  Sickle cell anemia is predominately a black illness.  Ex 1 Tr Plf, p. 124, ln 3-6.

**PF7:**  None of the persons identified in DF29 as complaining about the Plaintiff were black.  Ex 1 Tr Plf, p. 117, ln 17 to p. 118, ln 13.

**PF8:**  Defendant has a disciplinary policy and claims to follow progressive discipline.  This policy applied to the Plaintiff.  Ex 3 Tr Valenzuela, p. 20, ln 21 to p. 25, ln 10; Ex 9 Tr Jordan (Corp.Rep) p. 29, ln 14 to p. 30, ln 12;  Ex 13.  The policy provides for four steps prior to termination– 1st written reminder, 2nd written reminder, decision-making leave (leave with pay), then termination.  Ex 13 (Bates 320).

**PF9:**  Prior to being terminated, the Plaintiff had not been disciplined or counseled in any manner.  Ex 1 Tr Plf, p. 251, ln 24 to p. 252, ln 17; Ex 3 Tr Valenzuela, p. 16, ln 1 to p. 20, ln 20 (agreeing to discipline but claiming coaching).

**PF10:** Although Valenzuela claims to have coached the Plaintiff (Ex 3 Tr Valenzuela, p. 16, ln 15 to p. 19, ln 15 & Ex 11), Plaintiff denies that this ever occurred.  Ex 1 Tr Plf, p. 252, ln 15-

17; Ex 10 OESC TR, p. 47, ln 18 to p. 48, ln 10.  Plaintiff also denies the substance of the claimed coaching notes.  Ex 1 Tr Plf, p. 299, ln 4-12. The claimed coaching document does not conform to Defendant's coaching policy as no copy was given to the Plaintiff (Ex 10 OESC TR, p. 47, ln 18 to p. 48, ln 10, Ex 1 Tr Plf, p. 290, ln 15-23) and the Plaintiff did not sign the document.  See Ex 11 (alleged coaching note) and Ex 13 Disciplinary Policy, at Bates 322 subpart "f" (give copy to employee & get employee's signature). Defendant initially reported that there was no counseling. Ex 12 Term Form (at 202, No. 1 "Dates of previous discussions concerning this issue[:] **None**)(emphasis supplied)  Plaintiff had stated that during the conference on Monday, following the meeting with Dr. Mohammed:

> Sammye came to my office and said that she wanted this to be a learning experience for me & that this should never happen again.  Also, she sat down & drew an imaginary circle to represent me as a case manager & a line with another circle of multiple circle [sic] to represent the other team members.  She said that case managers just oversee what the team is doing.  She said that she wanted to get me with that Dr. but not right now.  She said that I was such a good nurse.  She left and patted me on the back.

Def Ex 9 (Bates 99).

**PF11:** Defendants are supposed to apply the disciplinary policy in a uniform, consistent manner. Ex 32 (Handbook, at p 11, Bates 80); Ex 9 Tr Jordan, p. 32, ln 17 to p. 33, ln 2.  According to Defendant's policy there is **never** an occasion where an employee is terminated without prior suspension pending an investigation.  Ex 13 (Progressive Discipline Policy, at Bates 327) ("There is **no offense** that warrants discharge on the spot.  For a serious offense, use the statement, "You are **suspended pending investigation**. . .")(bold supplied); Ex 13 (Progressive Discipline Policy, at 328, bottom of page).  **Only** conduct so serious as to require immediate suspension is subject to immediate termination and this was not done with the Plaintiff.  Ex 3 Tr Valenzuela, p. 74, ln 14 to p. 76, ln 5.

**PF12:** Prior to being terminated, Plaintiff had complained about both racial comments and the care being given to the black patient:

- See RDF30-33 describing the racial remark by a co-worker and Plaintiff's complaint.

- See RDF34-35 describing the complaints about patient care.  Also Ex 1 Tr Plf, p.

188, ln 20-23; p. 189, ln 13-16; p. 191, ln 5 to p. 193, ln 7, p. 286, ln 2-19.

**PF13:** Valenzuela terminated Plaintiff on March 15, 2011, less than five weeks after Plaintiff's complaint of racial harassment and less than two weeks after the patient complaints. Ex 12 Termination Form (EEOC ROB 202); Ex 3 Tr Valenzuela, p. 14, ln 13-18; RDF 30–33 (incident on Feb 11, report thereafter), PF 5, DF12 (patient admitted on March 4).

**PF14:** Valenzuela denies receiving either the complaint about the racial comment (Ex 3 Tr Valenzuela, p. 52, ln 11-17; p. 68, ln 7-10) or the complaints about patient care of the black patient. **Id.**, p. 55, ln 9 to p. 56, ln 9. However, Valenzuela was aware of Plaintiff's patient concerns because these are reflected in the notes Valenzuela made. Ex 15, (Plaintiff "empowered the pt [patient]" at Bates 198). Ex 16 ( Plaintiff "was telling resident team they should consult and criticizing them", at Bates 193).

- Valenzuela was required to, but did not, report Plaintiff's complaint of discrimination and complaints about the patient's care to HR and such complaints should have been investigated. Ex 3 Tr Valenzuela, p. 52, ln 18 to p. 54, ln 24, p. 67, ln 23 to p. 68, ln 10; Ex 9 Tr Jordan, p. 105, ln 16 to p. 106, ln 11; Ex 1 Tr Plf, p. 104, ln 6 to p. 105, ln 15; Ex 4 Tr. Martin p. 41, ln 18 to p 43, ln 10.

- Defendant admits that Plaintiff's reported concerns involve matters of patient health and safety. Ex 2 Tr Schram, p. 57, ln 2-7. Valenzuela did not report Robinson's concerns to HR in seeking approval to terminate Plaintiff. Ex 3 Tr Valenzuela, p. 63, ln 11-12; p. 67, ln 23 to p. 68, ln 4.

**PF15:** The termination document says the reason for termination was that Plaintiff's job was "[t]o work within the scope of practice for a nurse and a case manager" and she took "actions. . . outside her scope." Ex 12 (at Bates 202 and 204, last block). The actions described involved seeking information about the patient's disease and available services without being told to and asking the patient if the patient would accept an IV pain pump. **Id.**

**PF16:** Plaintiff did not step outside her role as case manager and **Defendants cite no facts to show that gathering information, identifying resource or securing patient input is contrary**

8

to either rules or Plaintiff's job description. As a Case Manager, each of Plaintiff's acts were within her job description. Neither the job description or rules require physician approval before gather information, identifying resources or seeking patient input.  Ex 14 (job description), Ex 1 Tr Plf, p. 253, ln 20 to p. 280, ln 13 (addressing each act, summarized at p. 280, ln 9-13 ("[D]id you do anything outside the scope of your job duty. . .? A.  I did not.").  *Also, id.*, p. 259, ln 20 to p. 260, ln 18 (explaining that actions were within job description).  Plaintiff's job duties included (without limitation) (**"Assume responsibility and accountability for individual knowledge, skill**. . .") "**maintaining competency in all areas of assigned duties**", "**Ensures consistent clinical standards of care and intervenes clinically as appropriate**:, "**Propose alternative treatment**. . .", "**Modifies or changes the plan as needed based on the evaluation of the effectiveness**", "**Ensure appropriate resource utilization**. . .", "**Ensures referrals and follow through**. . ." (Ex 14, Bates 187 under No's 2, 5 & 7), "**Participates in the education of the health team members on current healthcare issues (clinical and economic)**. . .", **"Assures appropriate tests and treatments to the diagnosis are performed in a timely manner**" (**id**., Bates 188 under No's 9, 10), "**Identifies and works to remove barriers that impede optimal patient care**", **"Record and appropriately manage patient and family concerns and complaints**. . ." (*id*, Bates 189 under No. 12); "**Evaluating team members' performance**. . .", "**Actively seeks innovative methods of learning information relevant to Case Management practice**", "**Actively participates in staff and physician education regarding case management, managed care**. . .", "**Demonstrates sensistiviety and responsiveness to patient, family and visitor needs**", "**Demonstrates a caring and compassionate attitude with patients, families**. . ." (**Id**., Bates 190). Valenzuela testified Plaintiff was responsible for educating herself on the appropriate level of care required for a patient and ensuring the patient was given adequate care (Ex 3 Tr Valenzuela, p. 40, ln 18 to p. 41, ln 18; p. 43, ln 3-11) but then claimed Plaintiff was terminated in part for trying to "learn more about the care of that particular patient without the physician asking or ordering that to happen."  Ex 3 Tr

9

Valenzuela, p. 25, ln 11 to p. 27, ln 20.  **Defendants do not identify any policy violations nor any deviations from Plaintiff's job description  in their statement of facts.**

**PF17:**   The disciplinary policy requires that the employee be given a copy of the document and  have an opportunity to comment and sign the document.  Ex 13 (Bates 327); Ex 12 (Bates 202-204).  The form was not given or shown to Plaintiff (Ex 1 Tr Plf, p. 280, ln 14-24) nor was she shown any notes (if any were attached) or told the contents of the complaints.  Ex 1 Tr Plf, p. 289, ln 13 to p. 292, ln 19; p. 363, ln 12-18. That  Plaintiff was not shown or given the form is circumstantially shown by the lack of signature or employee comments.  Ex 12 (Bates 202, after Block 3 "ASK EMPLOYEE: 'What can you tell me about this?").  Had she been given the opportunity,  Plaintiff would have denied the allegations against her.  *Id*., p. 293, ln 14 to p. 298, ln 15; p. 299, ln 23 to p. 303, ln 6;  p. 331, ln 5-13; p. 351, ln 16-23. Further, the termination document contained material inaccuracies:

- It claimed Plaintiff was still in her probationary period (Ex 12 at Bates 202) when, in fact Plaintiff had a seniority date of 1998 and a recent hired date of 2008.  Ex 17 (SJ Robinson 114, seniority date of 3/5/98, hire date 12/30/08); Ex 5 Plf Aff Para. 7.

- It claimed the Plaintiff clearly understood the rule or policy (Ex 12 Termination Doc, Bates 202, No's 2, 3), but it has been admitted that there was no written rule or policy covering the matters in the termination.  Ex 3 Tr Valenzuela, p. 32, ln 21 to p. 33, ln 34, ln 21; p. 36, ln 16- to p. 38, ln 14.  Plaintiff states she never knew of a rule violation (Ex 1 Tr Plf, p. 281, ln 13-25; Ex 5 Plf Aff. Para. 5) and that when she was talked to about the doctor complaints she was told "this was to be a learning experience for me".  Def's Ex 7, Bates 99.  Also see PF 9-10, above (disputing that a prior alleged counseling had occurred).

- The form claims that the discipline (termination) was consistent with actions taken against other employees.  Ex 12 (Bates 202, No. 6).  In fact, the discipline was not consistent as set out in PF 18, below.

10

**PF18:**  Defendant and Valenzuela treated Caucasian employees who had not complained more favorably than Plaintiff.  The following were all white Case Managers, supervised by Valenzuela, who had documented policy violations.

A.  J. M. violated HIPAA but was not fired although she was placed on the decision-making leave reserved for termination offenses.  Ex 18 (J.M. Disciplinary Documents, SJ-ROBINSON 3594-3596); Ex 9 Tr Jordan, p. 107, ln 24 to p. 110, ln 8; p. 111, ln 1-22.

B.  P.E. violated HIPAA, was given a decision making leave but not fired.  Ex 19 (P.E. Decision Making Docs, SJ-ROBINSON 3868-3871).  Thereafter Valenzuela received multiple complaints about P.E. not performing her job and gave P.E. a "second written reminder" and allowed her to continue working.  Ex 20 (P.E. Second Reminder, SJ-ROBINSON 4049-4052); Ex 21 (Complaints Re: P.E., SJ-ROBINSON 4053-55); Ex 9 Tr Jordan, p. 111, ln 1 to p. 114, ln 9.

C.  J.H. was terminated on December 12, 2011, however prior to the termination J.H. was disciplined by Valenzuela **and** given six weeks to improve her performance.  Ex 3 Tr Valenzuela, p. 76, ln 8 to p. 77, ln 16; Ex 22 (J.H. Discipline, SJ-ROBINSON 1779).

D.  Valenzuela did not fire J.E. for failing to carry out physician orders, Ex 9 Tr Jordan, p. 85, ln 4 to p. 87, ln 6; Ex 23 (J.E. Discipline, SJ-ROBINSON 2886-2888).

E.  **In 2007 R. M. acted outside the scope of her job by giving medication without prior approval, but Valenzuela gave her only a coaching**.  Ex 9 Tr Jordan, p. 94, ln 21 to pg. 95, ln 3; Ex 24 (2007 Discipline, SJ-ROBINSON 2972).  In 2008 R.M. was disciplined for making racial comments to a co-worker, but was given only coaching.  Ex 25 (R.M. Coaching, Co-worker complaint, SJ-ROBINSON 2969-2971).  In 2010 R.M. was sent home pending an investigation, but only terminated *after* the suspension and investigation. Ex 26 (Valenzuela Ltr, SJ-ROBINSON 2964-65).

**PF19:** Conduct that violates federal law, such as HIPAA, is more serious misconduct than the conduct engaged in by the Plaintiff, which did not violate federal law.  Ex 4 Tr Martin, p. 69, ln 5 to p. 70, ln 12 (Q: "Would conduct, in your understanding of the disciplinary policy, conduct that violated federal law such as HIPAA be more serious than conduct that did not violate the law?" [objection omitted] A: "More serious in the ramifications that would follow out . . . .").   Jordan admitted that Plaintiff did not violate a legal regulation such as in the Nurses Practices Act.  Ex 9 Tr Jordan, p. 53, ln 23 to p 57, ln 7.

**PF20:** Defendant also made a false statements in its EEOC position statement, claiming that Plaintiff was previously counseled (PF 9, 10, above) and that Plaintiff "poisoned the relationship between the palliative care team and the patient. * * * the patient 'fired' the palliative care team" because of the Plaintiff.  Ex 27 (p 4, Bates 145).  Plaintiff was asked to speak to the patient because the team was already having difficulty (Ex 1 Tr Plf, p. 150, ln 17-24; p. 300, ln 9-20), and  Plaintiff did not actually talk to her until after palliative team was already discharged by patient.   Ex 2 Tr Schram, p. 10, ln 3-11 (Plaintiff's acts **"transpired in the patient's room <u>after</u> we had completed our evaluation"**); p. 21, ln 12-21 (patient made decision during the meeting with the team); p. 34, ln 13-23 (palliative team never saw patient after March 9); Ex 5, Plf Aff. Para. 4.  Plaintiff only saw the patient that once.  Ex 1 Tr Plf, p. 155, ln 20-23.

**PF21:** The complaints against Plaintiff included "telling the resident team they 'should consult [with] this [and] that'", Def Ex 7 (at Bates 204),  asking questions re: the patient's treatment, **id.**, at Bates 206, and "empower[ing] the pt [patient]".  **Id.**, at Bates 209.

## II. - THE STANDARD FOR SUMMARY JUDGMENT

This Circuit admonishes that courts "must be mindful that a ruling which deprives a party of a determination of the facts by a jury 'should be cautiously and sparingly granted'", *Greene v. Safeway Stores, Inc.*, 98 F.3d 554, 560 (10th Cir. 1996) (quotation omitted), and "the moving party [must show] beyond a reasonable doubt that it is entitled to summary judgment." *Trainor v. Apollo Metal Specialties, Inc.*, 318 F.3d 976, 979 (10th Cir. 2002).

Summary judgment is disfavored when the issue is "dependent on [the party's] intent [as this] is not easily ascertained and requires inferences drawn from [the party's] behavior." *Seamons v. Snow,* 206 F.3d 1021, 1028 & n. 2 (10th Cir. 2000). When "issues of witness credibility and veracity. . . are critical to the decisionmaking process. . . written submissions are a wholly unsatisfactory basis for decision", *Mathews v. Eldridge,* 424 U.S. 319, 343-44 (1976) (quotation marks and citation omitted), because "the best evidence [of discriminatory intent] often will be the demeanor of the decision-maker." *Snyder v. Louisiana,* 552 U.S. 472, 477 (2008) (Quotation omitted, *Batson* analysis). Thus, "summary judgment should seldom be used in employment discrimination cases" as such cases depend on credibility and intent. *O'Shea v. Yellow Technology Services, Inc.*, 185 F.3d 1093, 1098 (10th Cir. 1999) (quotation omitted).

In assessing a motion, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment] motion.' *United States v. Diebold, Inc*., 369 U.S. 654, 655 (1962) (per curiam). . . [T]his usually means adopting. . . the plaintiff's version of the facts." *Scott v. Harris*, 550 U.S. 372, 378 (2007) (alterations by the Court). Plaintiff's testimony need not be corroborated. *EEOC v. Warfield-Rohr Casket Co.*, 364 F.3d 160, 164 (4th Cir. 2004) A court must "draw all inferences in favor of the party opposing summary judgment." *O'Shea, supra,* 185 F.3d at 1096. "[A] non-moving party is not required to establish the existence of genuine issues of material fact for trial matters not addressed by the summary judgment motion." *O'Toole v. Northrop Grumman Corp.,* 305 F.3d 1222, 1227 (10th Cir. 2002). The court may not advance "what it considers to be a legitimate reason not articulated by the employer to rebut the plaintiff's prima facie case", *Bell v. AT&T*, 946 F.2d 1507, 1513 (10th Cir. 1991), as this deprives the employee of the opportunity to show pretext. *Id*., at 1513-1514.

With these standards in mind, Plaintiff will address Defendant's motion.

### III. - THE PRIMA FACIE CASES[2]

### A. - The Prima Facie Case Of Termination

Defendant at Prop. III(A)(2), p. 13-14, uses an incorrect variant of the prima facie

formulation which involves offering circumstantial evidence of discrimination/retaliation.  That is

not the standard formulation but rather an approach used in cases where the employer claims the job

plaintiff held no longer exists or in other unusual cases.   *See Kendrick v. Penske Transp. Servs.*,

220 F.3d 1220, 1227 (10th Cir. 2000) (underlining supplied):

> [T]his court has, on occasion, recited a more general test for determining if a plaintiff
> has established a prima facie case of discriminatory discharge. *See, e.g., Martin v.
> Nannie & the Newborns, Inc.*, 3 F.3d 1410, 1416-17 (10th Cir. 1993) (requiring
> plaintiff to show: (1) she belongs to a protected class; (2) she was qualified for her
> job; and (3) she was terminated under circumstances giving rise to an inference of
> discrimination). . .  But ordinarily, more structure and guidance can be found in the
> traditional four prongs of the *McDonnell Douglas* prima facie test. Those four
> factors, if shown, do 'give rise to an inference of discrimination' according to the
> Supreme Court, and thus satisfy the more generalized third factor expressed in
> *Martin v. Nannie and the Newborns*.

*Baca v. Sklar*, 398 F.3d 1210, 1216 (10th Cir. 2005) sets out the standard formulation:

> [A] plaintiff in a wrongful termination suit establishes a prima facie case of
> discrimination by showing that: (1) he belongs to a protected class; (2) he was
> qualified for the job; (3) despite his qualifications, he was discharged; and (4) the job
> was not eliminated after his discharge. . .[3]

There is no doubt Plaintiff establishes the prima facie case.  She is African-American (PF1),

she was qualified for the job (PF3), she was discharged (PF2, 13) and she was replaced by Caucasian

employees who had not made complaints.  PF4.

### B. - The Prima Facie Case Of Retaliation

Defendant does set out the correct elements of a prima facie case of retaliation,  Def Mt Prop.

III(A)(3), p. 14-16, but Defendant fails to properly analyze the elements.   While conceding the

second element (Defs' Motion, p. 15), Defendant erroneously challenges the first (protected activity)

---

[2]  Plaintiff does not contend that there is direct evidence of racial discrimination so
Defendants' arguments at Prop. III(A)(1), p. 12–13 are moot.

[3]  *Perry v. Woodward* explains that it is not necessary to show that Plaintiff was replaced
by a person from a different protected category.  199 F.3d at 1140.  *Accord Kendrick v. Penske
Transp. Servs.*, 220 F.3d 1220, 1228-1229 (10th Cir. 2000).

and second (causal connection) elements.  *Id*.

## 1. - The Complaint Was A Protected Act

Although the decisionmaker denies Plaintiff reported the racial comment, she admits that if made such comment would be a protected report to be investigated.  PF14.  There is no dispute that taking Plaintiff's account as true (required at this stage), Plaintiff made a report of a racial comment directed towards her which she found offensive and which Defendant admitted was protected. RDF30-33, PF12.  Contrary to Defendant's argument, Title VII protects employees who report racial remarks *before* those remarks so pollute the workplace that they give rise to a hostile environment.

Defendant relies on the unpublished and non-precedential decision in *Robinson v. Cavalry Portfolio Servs., LLC*, 365 Fed. Appx. 104 (10th Cir. 2010) to avoid this rule, but *Robinson* is distinguishable on the material facts.  The employer asked "KaRon and Torres for interviews and to give written statements" about a potential racial incident.  *Id*., at 108.  In response, plaintiff reported she heard Torres use a racially offensive term in a conversation between different employees.  *Id*.  The employer "gave Torres a verbal warning that his conduct would not be tolerated and any further similar conduct would lead to disciplinary action, including termination." *Id*., at 109. The Tenth Circuit, *id.* at 113[4] (emphasis added), concluded that "No reasonable person could have believed that the single Torres incident violated Title VII's standard [because] *KaRon's*, [did]  not claim [the employer] did anything wrong."

Though unpublished and contrary to other albeit unpublished Tenth Circuit cases,[5] *Robinson*

---

[4]   *Robinson* relied on *Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 271 (2001). The limited question in *Breeden* was whether an employee's belief that particular conduct was **unlawful** should be tested *subjectively* or *objectively*.  *Id*., at 270.  *Breeden* concluded that an objective test applied.  *Breeden* did not consider the case presented here where the protection asserted is based on an objectively offensive act which the employee is encouraged by law to report *before* the conduct culminates in a hostile environment.  The subsequent decisions of *Morgan*, *Burlington* and *Crawford* clarify that such conduct is protected.

[5]   *Oliver v. Peter Kiewit & Sons/Guernsey Stone*, 106 Fed.Appx. 672, 675 (10th Cir. 2004) and *Hertz v. Luzenac Am., Inc*., 370 F.3d 1014, 1015-1016 (10th Cir. 2004) ("A plaintiff need not convince the jury that his employer had actually discriminated against him; he need only show that when he engaged in protected opposition, he had a reasonable good-faith belief that the opposed behavior was discriminatory.")

did not involve a racial remark towards the complaining employee, nor a situation where the employer failed to act on the complaint– the situation here.  In response to Plaintiff's complaint Valenzuela became angry, told Plaintiff she needed "thicker skin" and to "forget everything". RDF30-33.   This is a protected report because under *AMTRAK v. Morgan*, 536 U.S. 101, 115 (2002) (internal citation omitted, emphasis added) it is a report of a *component* of a hostile environment:

> Hostile environment claims are different in kind from discrete acts. Their very nature involves repeated conduct. The 'unlawful employment practice' therefore cannot be said to occur on any particular day. It occurs over a series of days or perhaps years **and, in direct contrast to discrete acts, a single act of harassment may not be actionable on its own**. . . **Such claims are based on the cumulative affect of individual acts**.

The report of "a single act of harassment. . . not . . . actionable on its own", *Morgan,* would be protected because case law "encourage[s] employees to report harassing conduct **before it becomes severe or pervasive** [to] serve Title VII's deterrent purpose." *Burlington Indus. v. Ellerth,* 524 U.S. 742, 764 (1998) (emphasis supplied).  "It would therefore implement clear statutory policy and complement the Government's Title VII enforcement efforts" to protect reports made before the work environment was actionably hostile.   *Faragher v. City of Boca Raton*, 524 U.S. 775, 806 (1998) (emphasis added).

> . . . 'Plainly, effective enforcement could thus only be expected if employees felt free to approach officials with their grievances.' *Mitchell v. Robert DeMario Jewelry, Inc.*, 361 U.S. 288, 292 (1960). Interpreting the antiretaliation provision to provide broad protection from retaliation helps ensure the cooperation upon which accomplishment of the Act's primary objective depends.

*Burlington Northern & Santa Fe Ry. v. White*, 548 U.S. 53, 67 (2006).  *White*'s interpretation that Title VII's anti-retaliation provisions "provide broader protection for victims of retaliation than for those [who are] victims of race-based. . .  discrimination", *id*, at 66, indicates that complaints do not have to be presently actionable to be protected.

To encourage employees to report harassment before it becomes actionable, but then to deny protection for such reports "would undermine the effectiveness of Title VII [and] deter [employees] from complaining to the EEOC, and would provide a perverse incentive for employers to fire

employees who *might* bring Title VII claims." *Robinson v. Shell Oil Co.*, 519 U.S. 337, 346 (1997),

emphasis supplied.   In a closely analogous context *Crawford v. Metro. Gov't of Nashville & Davidson County,* 555 U.S.271, 279 (2009) explained:

> . . .'[f]ear of retaliation is the leading reason why people stay silent instead of voicing their concerns about bias and discrimination.' **Brake, Retaliation**, 90 Minn. L. Rev. 18, 20 (2005); *see also id.*, at 37, and n. 58 (compiling studies). The appeals court's rule would thus create a real dilema for any knowledgeable employee in a hostile work environment... If the employee reported [harassment before it became severe], the employer might well be free to penalize her for speaking up. But if she kept quiet . . . and later filed a Title VII claim, the employer might well escape liability, arguing that it 'exercised reasonable care to prevent and correct [any discrimination] promptly' but 'the plaintiff employee unreasonably failed to take advantage of . . . preventive or corrective opportunities provided by the employer.' *Ellerth, supra*, at 765. Nothing in the statute's text or our precedent supports this catch-22.

This approach has been followed by other Oklahoma federal judges:

>   A reasonable belief can be based on 'an action of sexual harassment,' and incident that does not 'rise[] to the level of a Title VII violation.' *Oliver v. Peter Kiewit & Sons/Guernsey Stone*, No. 03-8036, 106 Fed.Appx. 672, 675, 2004 WL 1771570, at * 2 (10th Cir. August 9, 2004) (unpublished).  This conclusion is bolstered by the fact that, as noted by the plaintiff, a hostile environment often consists of a series of acts, none of which would be actionable alone.  To require an employee to wait until the work environment was 'hostile' before he reported any harassment would be contrary to Title VII's deterrent purpose. . . .

*Bishop v. Veloia Water North America-West, LLC*., CIV-07-1447-HE (Feb 22, 2008), Ex 31, p. 3.

**WHEREFORE,** the report was protected.

## 2. - Timing Establishes The Causal Connection

Defendant erroneously claims that Plaintiff cannot show a causal connection because she was terminated based on physician complaints.  Def's Mt Prop. III(A)(4), p. 16.  This is not part of the prima facie case.  "If an employer is dissatisfied with the performance of an employee, he can properly raise the issue in rebuttal of the plaintiff's showing."  *Denison v. Swaco Geolograph Co.*, 941 F.2d 1416, 1421 (10th Cir. 1991) (quoting *Powell v. Syracuse Univ.*, 580 F.2d 1150 (2d Cir. 1978)).  Numerous cases hold it is error to consider such reasons at the prima facie stage.  *See MacDonald v. Eastern Wyoming Mental Health Center*, 941 F.2d 1115, 1119-20 (10th Cir. 1991), *inter alia.*

17

The temporal proximity between the complaints (5 weeks & two weeks, PF 13) is sufficient to show causation at the prima facie stage. *See Trujillo v. PacifiCorp*, 524 F.3d 1149, 1157 (10th Cir. 2008) ("temporal proximity of nine weeks could establish causation" citing and summarizing *Anderson v. Coors Brewing Co.*, 181 F.3d 1171, 1179 (10th Cir. 1999)).

**WHEREFORE,** Plaintiff has established a prima facie case.

## IV. - EVIDENCE OF PRETEXT AND DISCRIMINATION/RETALIATION

Defendant's reason is that Plaintiff took "actions. . . outside her scope" of authority. PF15.[6] Plaintiff will address this claim after addressing Defendant's preliminary arguments.

At Prop. III(a)(4), p. 16-18 Defendant argues that a but-for standard of proof applies, *id.*, p. 16, which is true for the retaliation claim but not for the discrimination claim. *University of Texas Soutwest Medical Center v. Nassar.*, 570 U.S. __, 133 S.Ct. 2517 (2013) held that status-based claims are governed by 42 U.S.C. "§2000e–2(m)" which provides for "a lessened causation standard." 133 S.Ct. at 2526. "**The lessened causation standard would make it far more difficult to dismiss. . . claims at the summary judgment stage**." *Id.*, at 2532 (emphasis added). 42 U.S.C. § 2000e-2(m) makes the employer liable if race "was a motivating factor for any employment practice, **even though other factors also motivated the practice**."

---

[6]  The termination document does not claim Plaintiff was fired because of interpersonal relations with physicians, but because Plaintiff was acting outside the scope of her authority. **Defendant does not claim and has offered no evidence that Plaintiff could be fired merely because physicians were upset without a showing that Plaintiff had actually breached a rule or a part of her job description.**  If Defendant were to rely on physician preference that would subject those preferences to the same pretext inquiry (i.e., the legitimacy of the complaints) set out hereafter.  Accordingly, Defendants cannot rely merely on physician preference as "third party preferences for discrimination" are no defense. *Lam v. University of Hawaii*, 40 F.3d 1551, 1560 n. 13 (9th Cir. 1994). *Accord Cf. Chaney v. Plainfield Healthcare Ctr.*, 612 F.3d 908, 913 (7th Cir. 2010) (customer preference no defense, collecting cases). Similar to the race remark Plaintiff complained about, firing her for doing her job could be viewed as reflecting a discriminatory race-based attitude:

> The suggestion that humility is an attractive quality in African-American men harkens back to the racial politics of the Jim Crow era, when African-Americans who sought upward social mobility were denigrated as 'uppity.' See, Terry Smith, **Everyday Indignities: Race, Retaliation, and the Promise of Title VII**, 34 Colum. Hum Rts. L. Rev. 529 (2003). . . .

(emphasis added).  Under this standard it is unnecessary to prove any of the employer's reasons are pretextual.  *See White v. Baxter Healthcare Corp.*, 533 F.3d 381, 401 (6th Cir. 2008), inter alia. Moreover, Plaintiff need only disprove the dominant reasons (over-stepping boundaries) to show pretext.  *Bryant v. Farmers Ins. Exch.*, 432 F.3d 1114, 1127 n.6 (10th Cir. 2005).

Finally, Defendant attempts to bolster its argument by resort to the "same actor" inference. "The same actor inference applies when the same *individual* hires and fires the plaintiff."  *Hartsel v. Keys*, 87 F.3d 795, 804 (6th Cir. 1996) (emphasis supplied).  Defendant has offered no evidence that Valenzuela (the decision-maker) hired Plaintiff or that this was a recent action.  Moreover, "'same actor' evidence gives rise to an inference, rather than a presumption".  *Antonio v. Sygma Network, Inc.*, 458 F.3d 1177, 1183 (10th Cir. 2006).  As a mere inference, it is insufficient as a basis for summary judgment because inference may not be drawn in favor of the movant.  *See Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 150 (2000) (on summary judgment "the drawing of legitimate inferences from the facts are jury functions, not those of a judge") and *O'Shea, supra,* 185 F.3d at 1096 (10th Cir. 1999) ("we must draw all inferences in favor of the party opposing summary judgment").  *Accord Williams v. Vitro Servs. Corp.*, 144 F.3d 1438, 1443 (11th Cir. 1998) ("It is the province of the jury rather than the court . . . to determine whether the inference generated by 'same actor' evidence is strong enough to outweigh a plaintiff's evidence of pretext.")

Here Defendant argues that Plaintiff engaged in "taking actions that had not been ordered by the attending physician. . . and gave the patient *information* that *conflicted* with the recommendations of the Palliative Care Team."  Mt, p. 17.[7]  **Defendants cite nothing in the record to show that a physician's orders were required for any act or that giving a patient information is a violation of any rule or protocol.  Defendant offers no evidence that Plaintiff (a) violated any written or unwritten rule or protocol or (b) violated her job description.**

---

[7] No evidence suggests that Plaintiff did more than **ask** if the patient would use such a device *after the palliative team had already been fired*. That action is part of her job description of "demonstrat[ing] sensitivity and responsiveness to patient", "a caring and compassionate attitude" and "managing patient. . . concerns".  (PF 16, Ex 14, at Bates 190, 189).  However it would have been proper for her to "[p]ropose alternative treatment" or "modif[y] or change[] the plan".  *Id.*, at 187.

Defendant actually admits there is no written policy or procedure which is violated by any of Plaintiff's acts, RDF14, 18-25, 26, and even if there is an unwritten policy, "unwritten policies, as opposed to written policies, can be easily turned into tools of discrimination." *Dunning v. National Indus.*, 720 F.Supp. 924, 931 (M.D.Ala.1989) . *See Cortez v. Wal-Mart Stores, Inc.*, 460 F.3d 1268, 1276 (10th Cir. 2006) (pretext for jury when employer relies on an unwritten rule) and *Conner v. Ft. Gordon Bus Co.*, 761 F.2d 1495, 1500 (11th Cir. 1985) ("The use of unannounced policies, interpreted according to subjective criteria, will tend to support a plaintiff's claim of pretext.")

While Defendant claims to have counseled Plaintiff on overstepping boundaries, Plaintiff denies any such counseling ever occurred and never saw or signed the handwritten note Defendant relies on.  PF9-10. Indeed, that note is inconsistent with both Defendant's policies requiring an employee signature (PF10, 17) and the termination document saying there was no prior counseling on the issue causing termination.  *Id*.  A jury could find the "counseling document" was manufactured after the fact to cover-up discriminatory/retaliatory termination and "from 'the fact of a cover-up, the factfinder . . . might conclude that the employer lied to cover up a discriminatory decision'".  *Orr v. City of Albuquerque*, 531 F.3d 1210, 1216 n. 4 (10th Cir. 2008) (quoting with approval Martin J. Katz, **Reclaiming McDonnell Douglas**, 83 Notre Dame L. Rev. 109, 127-28 (2007)). *Reeves v. Sanderson Plumbing Products, Inc.*, 530 U.S. 133, 147 (2000) ("[T]he general principle of evidence law [is] that the factfinder is entitled to consider a party's dishonesty about a material fact as affirmative evidence of guilt." Quotation omitted, citing to 2 J. Wigmore, **Evidence** § 278(2), p. 133 (J. Chadbourn rev. 1979)).

The same inference of pretext arises as to Plaintiff's claim that she reported racial remarks and concerns over patient treatment (RDF 30-33, 34-35, PF 12)– both of which the decision-maker denies.  PF2, 14.  Because it must be assumed the jury will believe the Plaintiff, the denial creates an inference of pretext.  *Cf. Barefield v. Bd. of Trs.*, 500 F. Supp. 2d 1244, 1268 (E.D. Cal. 2007) (a jury could "infer[] that the reason he denied knowing her race was to disguise his use of an impermissible motive.") Additionally, the reported hostility to the complaint (RDF 30-33) is

evidence of retaliatory intent. *Waters v. Churchill,* 511 U.S. 661, 681-682 (1994) (that "management had exhibited some sensitivity about the criticisms" may demonstrate retaliatory intent).

An additional irregularity is that Plaintiff was supposed to be told of charges and be allowed to respond; she was not. PF17. *Jackson v. Albuquerque*, 890 F.2d 225, 230 (10th Cir. 1989) (failure to provide specifics of charges an indication of pretext). *Cf. Machinchick v. PB Power, Inc.*, 398 F.3d 345, 355 n. 29 (5th Cir. 2005).

Even if Plaintiff's actions could construed as a violation of an unannounced policy, Plaintiff was treated more severely than Caucasian employees who committed the same or worse infractions. PF18. This also shows pretext. *See Metropolitan Edison Co. v. N.L.R.B.* 460 U.S. 693, 693 (1983) (discrimination shown when employer "disciplined the local union officials more severely than the other participants"); *McAlester v. United Air Lines, Inc.*, 851 F.2d 1249, 1261 (10th Cir. 1988) (discrimination when non-minorities disciplined less severely), *inter alia*.

Finally, it must be remembered that this is a case where (a) the decision-maker is Caucasian, (b) Plaintiff and the patient for whom she was advocating were both African-American and even the patient's disease was one particularly afflicting African-Americans, and (c) Plaintiff was replaced by Caucasians. PF1-2, 4-6. "At this [pretext] stage, the trier of fact may consider evidence establishing the prima facie case and ""inferences properly drawn therefrom . . . on the issue of whether the defendant's explanation is pretextual."' *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)." *Trujillo v. PacifiCorp*, 524 F.3d 1149, 1155 (10th Cir. 2008).

While Defendant argues that proving a trial fact of pretext/retaliation is a "lofty burden" (Mt, p. 17), this is not what the case law says. The Tenth Circuit has "emphasize[d] that at the summary judgment stage 'all doubts concerning [circumstantial evidence and] pretext must be resolved in plaintiff's favor.'" *Doebele v. Sprint/United Management Co.,* 342 F.3d 1117, 1138-39 (10th Cir. 2003) (quotations omitted). "This burden is not onerous". *Hardy v. S.F. Phosphates Ltd. Co.,* 185 F.3d 1076, 1080 (10th Cir. 1999). Judgment is proper only if plaintiff 'failed to produce *any* evidence from which a reasonable inference could be drawn' that [Defendant]'s proffered reasons were pretextual. *Stinnett v. Safeway, Inc*. 337 F.3d 1213, 1218 (10th Cir. 2003) (quotation omitted,

emphasis supplied). **Even "if the plaintiff created only a weak issue of fact as to whether the employer's reason was untrue", summary judgment will not be proper**. *Jones v. Okla. City Pub. Schs*, 617 F.3d 1273, 1281 (10th Cir. 2010) (quotations omitted, emphasis added).  Further, circumstantial evidence must be assessed as a whole because "individual pieces of evidence, insufficient in themselves to prove a point, may in cumulation prove it.  The sum of an evidentiary presentation may well be greater than its constituent parts." *Bourjaily v. United States*, 483 U.S. 171, 179-80 (1987).  Even when "[n]one of the admissible, relevant evidence. . . standing alone, is sufficient to raise a genuine issue of material fact on pretext [Plaintiff's evidence] considered in the aggregate and construed in the light most favorable to [Plaintiff, allows], a reasonable jury could conclude that Defendant's proffered explanation. . .  is pretextual." *EEOC v. Horizon/CMS Healthcare Corp*., 220 F.3d 1184, 1200 (10th Cir. 2000).

**WHEREFORE**, Plaintiff has made the requisite showing of pretext.

## V. - THE PUBLIC POLICY CLAIM

Defendant attacks Plaintiff's public policy claim in Prop. III(B), p. 18-25.  In addressing this claim, Plaintiff would point out that five areas of conduct are available to support a *Burk* claim, at least three of which are implicated here:

> Within the five protected public-policy areas identified in *Hinson* lies an employee's discharge for: (1) refusal to participate in an illegal activity; (2) **performance of an important public obligation**; (3) exposure of some wrongdoing by the employer; (4) **exercise of a legal right or interest** and (5) **performance of an act that public policy would encourage, or for refusing to do something that public policy would condemn**, when the discharge is coupled with a showing of bad faith, malice or retaliation.

*Gilmore v. Enogex, Inc*., 1994 OK 76, 878 P.2d 360, 363 n. 11 (emphasis supplied).

The elements of a *Burk* claim are as follows:

> The elements of a claim for wrongful discharge of an at-will employee articulated in *Burk* and its progeny can be summarized: A viable *Burk* claim must allege (1) an actual or constructive discharge (2) of an at-will employee (3) in significant part for a reason that violates an Oklahoma public policy goal (4) that is found in Oklahoma's constitutional, statutory, or decisional law or in a federal constitutional provision that prescribes  a norm of conduct for Oklahoma and (5) no statutory remedy exists that is adequate to protect the Oklahoma policy goal.

*Vasek v. Bd. of County Comm'rs*, 2008 OK 35, ¶14, 186 P.3d 928, 932.

Defendant attacks only two of these elements: a) existence of a public policy, and b) causation. As such Plaintiff need not address the other elements. *See O'Toole, supra,* 305 F.3d at 1227 (responding party need not address issues not raised by the movant).

### A. - A Public Policy Exists

"When attempting to find and articulate a clear mandate of public policy, we look to the letter or purpose of a constitutional, statutory, or *regulatory* provision." *Gilmore, supra*, 878 P.2d at 364 n. 19 (emphasis added). The policies at issue are found in both the statutes and regulations pertaining to nurses. 59 O.S. § 567.8 provides in relevant part:

> B. The Board shall impose a disciplinary action against the person pursuant to the provisions of subsection A of this section upon proof of one or more of the following items. The person: * * *
>
> 3. Fails to adequately care for patients or to conform to the minimum standards of acceptable nursing or advanced unlicensed assistant practice that, in the opinion of the Board, unnecessarily exposes a patient or other person to risk of harm; * * *
>
> 9. Violated a rule promulgated by the Board. . . * * *

The implementing rules OAC 485:10-11-1(b)(3) define "unprofessional conduct" to include "(I) Discriminating in the rendering of nursing services or patient care assignment." In addition to disciplinary penalties, 59 O.S. § 567.9 makes any such violation of the statute or regulations a criminal misdemeanor. "Declaring a violation of the. . . Act to be a misdemeanor emphasizes the compelling nature of the . . . policy expressed". *Reynolds v. Advance Alarms, Inc*., 2009 OK 97, ¶13, 232 P.3d 907, 911. *Cf. Green v. Bd. of County Comm'rs*, 2007 U.S. Dist. LEXIS 42995, *11-12 (W.D. Okla. 2007) (*Burk*-tort will be recognized when "the statutes relied on to state the public policy. . . [are] criminal statutes, and thus within the category of statutes recognized as potentially providing a public policy.")

Plaintiff reported complaints that the patient was not appropriately treated because she did not "warm the hearts" of the treating team. RDF 34-35. "[R]eports . . . that relate directly to patient safety [are] **matters which concern and further public-interest protections**." *Darrow v. Integris Health, Inc.*, 2008 OK 1, ¶17, 176 P.3d 1204, 1215 (emphasis supplied).

Defendant argues that Plaintiff was not required to violate any laws or regulations, Def's Mt,

part (a), p. 22, but that is not a necessary element.  Defendants cite no authority suggesting that a health care practitioner must be ordered to do something unlawful before reports directed at the conduct of others will be left unprotected.  Failure to provide supporting authority may be considered a waiver/forfeiture of the point.  *McKissick v. Yuen*, 618 F.3d 1177, 1189 (10th Cir. 2010) and *Rapid Transit Lines, Inc. v. Wichita Developers, Inc.,* 435 F.2d 850, 852 (10th Cir. 1970).

Next Defendant argues that the patient must *actually be placed* "at risk of harm or that the patient's life, health or safety were ever in jeopardy."  Def's Mt, part (b), p. 23-24.  Again, no such requirement exists and Defendant has cited no authority for such a limitation.  *Darrow* did not require a showing that anyone's health was actually placed in jeopardy in that one purpose of reporting is to *prevent* harm.  All that is required is "the **good faith reporting[8]** of infractions by the employer or co-employees of rules, regulations or the law pertaining to the public health, safety or general welfare."  *Hayes v. Eateries, Inc.*, 1995 OK 108, 905 P.2d 778, 786.

Defendants also make an argument that Plaintiff's opinions are "inadmissible" because "Plaintiff has no expert who will testify that any actions of any person put the patient at risk".  Mt., p. 24.  That, however, is neither the issue nor the test.  Expert testimony is not required to show the treatment team's attitude towards the patient.  A layman may testify as to attitude.  *United States v. Sneed,* 34 F.2d 1570, 1581 (10th Cir. 1994).  Here, the Plaintiff testified as to statements (patient didn't warm their hearts) and conduct (resistance to receiving information or assistance on patient's disease) which Plaintiff can properly report at the basis for her good faith belief that this patient was being discriminated against in treatment.

Plaintiff need not prove that this attitude lead to "malpractice".  Even if that were the standard (and it is not), it is the objective reasonableness of the Plaintiff's good faith which is the issue, **not the accuracy of the conclusion.** *Cf. Neely v. City of Broken Arrow*, 2007 U.S. Dist. LEXIS 39256, *4-5 (N.D. Okla. 2007) (Eagan, J.) ("It is well-established that a plaintiff can successfully maintain a retaliation claim even if the conduct which the plaintiff opposed (i.e. the

---

[8] As pointed out above, protection extends to opposing such conduct.  Also, purely internal reports are protected.  *Darrow, supra*, at ¶19 and p. 1215.

underlying conduct) does not actually violate Title VII.").  Even if expert testimony was required, it is clear that a nurse can testify as an expert *regarding the functions of her position*.  ***Gaines v. Comanche County Med. Hosp.***, 2006 OK 39, 143 P.3d 203, 209-201 (also noting "a trend towards allowing a nurse's testimony to be treated as an expert in an ever increasing number of arenas" and collecting cases as fn 16); *id*, Justice Opala concurring at 212-14 & fn 6.  ***Cf. Holt v. Wesley Med. Ctr.***, 2004 U.S. Dist. LEXIS 13814, *13-14 (D. Kan. July 19, 2004) (Nurse could testify as to nursing standards.  "Any alleged gap in Nurse Lundstrom's qualifications goes to the weight of her expert opinion and can be addressed by cross examination.").

### B - Causation Is Shown

Public policy torts only require that the cause be a "significant factor" which is "'a more lenient standard than the "but for" test,' ***Elzey v. Forrest***, 1987 OK 58, 739 P.2d 999, 1001 (Okla. 1987); ***Wallace v. Halliburton Co.***, 1993 OK 24, 850 P.2d 1056, 1059 (Okla. 1993)."  ***Medlock v. UPS, Inc.***, 608 F.3d 1185, 1194 n. 7 (10th Cir. 2010).  This proof can be sustained by using the ***McDonnell Douglas*** formulation.  ***Buckner v. General Motors Corp.***, 1988 OK 73, ¶¶ 9-11, 760 P.2d 803, 806-807.  Thus, Plaintiff's pretext arguments also establish causation for her public policy claim.  Nonetheless, "*If the employer admits that the [challenged act] played a prominent part in the decision*, . . . the burden-shifting framework may be unnecessary and inappropriate." ***Davidson v. Am. Online, Inc.***, 337 F.3d 1179, 1189 (10th Cir. 2003) (ADA case, emphasis supplied).

Here, the Defendant's reasons are specifically tied to Plaintiff's actions taken on behalf of the patient which provides direct evidence of causation.

**WHEREFORE,** causation is established.

**RESPECTFULLY SUBMITTED THIS 12th DAY OF AUGUST, 2013.**

HAMMONS, GOWENS, HURST
& ASSOCIATES

s/ Mark Hammons
Mark Hammons, OBA No. 3784
Amber L. Hurst, OBA No. 21231
325 Dean A. McGee Avenue
Oklahoma City, Oklahoma 73102
Telephone: (405) 235-6100
Facsimile: (405) 235-6111
*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

A true copy of the foregoing was filed and served by use of this Court's ECF system of filing and service to the opposing counsel below listed on this 12th day of August, 2013.

R. Charles Wilkin, III, OBA No. 18491
Audra K. Hamilton, OBA No. 17872
Wilkin, McMurray PLLC
1515 South Utica Avenue, Suite 200
Tulsa, Oklahoma 74103
Telephone: (918) 582-7100
Facsimile: (918) 582-7166
Email: ahamilton@wilkinmcmurray.com
        cwilkin@wilkinmcmurray.com
*Counsel for Defendant*

s/ Mark Hammons

26